KRIZON, Mark L., Plaintiff,

v.

Jo Anne BARNHART, Commissioner of Social Security,[1] Defendant.

C.A. No. 01–128 Erie.

United States District Court, W.D. Pennsylvania.

April 23, 2002.

1. Jo Anne Barnhart became the Commissioner of Social Security, effective November 14, 2001, to succeed Acting Commissioner Larry G. Massanari, who succeeded Commissioner Kenneth S. Apfel. Pursuant to Fed.R.Civ.P. 25(d)(1) and 42 U.S.C. § 405(g), Jo Anne Barnhart is automatically substituted as the defendant in this action.

Pamela M. Schiller, Blaufeld & Schiller, Pittsburgh, PA, for Plaintiff.

Marshall J. Piccinini, United States Attorney's Office, Erie, PA, for Defendant.

## MEMORANDUM OPINION

McLAUGHLIN, District Judge.

This is a social security action. Pursuant to 42 U.S.C. § 405(g), Mark. L. Krizon (hereinafter "Plaintiff") seeks review of the Commissioner of Social Security's decision to deny his claim for disability insurance benefits and social security income. Presently pending are cross-motions for summary judgment. For the reasons stated below, we will enter summary judgment in favor of Plaintiff, to the extent that we will remand.

## I. BACKGROUND

Plaintiff filed his applications for benefits on April 17, 1998, alleging that he has been unable to work since February 17, 1998 due to a back disorder, blood clots in his right leg and a right ankle injury. When he was sixteen years old, he had an accident in which his right leg was crushed. (AR at 198). He was 33 years old at the time the hearing decision was issued and has a high school education. While in high school, Plaintiff received vocational training in appliance repair and welding. (Administrative Record, hereinafter "AR" at 37).

Among other reports, the record contains medical reports from two physicians who treated Plaintiff: Dr. David Andres, D.O., Plaintiff's family doctor, and Dr. Robert J. Brocker, Jr., M.D., Plaintiff's neurologist. In February, 1998, after Plaintiff had been hospitalized for blood clots, Dr. Andres reported that he was doing fairly well. (AR at 191). He was having some numbness in his toes and a nerve conduction study was suggested, but ultimately not performed because Plaintiff had no insurance. Dr. Andres indicated that he did not feel permanent disability was a good idea, and thought that Plaintiff would be able to return to work if he watched over him for the next six weeks. (AR at 191). The following month, Dr. Andres indicated that he filled out a form keeping Plaintiff out of work until July 1. (AR at 190). In April, 1998, Plaintiff had the nerve conduction studies performed and an abnormality in his right foot was

revealed. (AR at 190). Dr. Andres consequently referred him to Failor and a physical therapist. Plaintiff appeared at this visit to be very hesitant to return to work, although Dr. Andres declined to refer him for permanent disability because he believed Plaintiff would be able to do something at some point in time. (AR at 190).

On June 2, 1998, Plaintiff visited Dr. Andres after falling down his stairs and injuring his shoulder, back and neck. (AR at 189). Dr. Andres observed that Plaintiff had been doing fairly well prior to the fall but was experiencing quite a bit of pain at this time. Plaintiff was told to undergo multiple x-rays and to follow up with the Pain Clinic. One week later, Dr. Andres reported that Plaintiff was not doing any better and changed his medications. (AR at 188). Plaintiff was taken off Coumadin, and was prescribed Plavix, Elavil, Relafen, and Esgic. Dr. Andres also noted that Plaintiff wanted to see Dr. Brocker and that that would be fine. In July, 1998, Dr. Andres reported that Plaintiff came in with many major complaints including arthritis pain, leg pain, back pain, groin pain from the DVT and headaches. (AR at 187). He observed that he was beginning to wonder whether Plaintiff's complaints were exaggerated. No changes were made at this visit other than increases in the dosage amounts of Esgic and Relafen.

Plaintiff told Dr. Andres that he was still having chronic pain in August, 1998, and Dr. Andres reported that the best course would be to have Dr. Brocker work on Plaintiff's back and neck pain, an orthopod work on Plaintiff's shoulder pain, and for he himself to continue to work on Plaintiff's DVT pain. (AR at 185). Dr. Andres also noted that Plaintiff would be seeing a physical therapist weekly in order to determine whether other changes needed to be made.

Plaintiff first saw Dr. Brocker on June 17, 1998. (AR at 200–201). At this visit, Plaintiff complained of pain and numbness in his right leg that radiated into his foot and toes. He said that he had had the pain for two months, that it was a 10 on a scale of 1 to 10 and occurred all the time, that it was relieved by nothing and was aggravated by bending, sitting, standing and walking. Dr. Brocker diagnosed chronic pain syndrome and lumbar radiculopathy, prescribed Neurontin and Percocet, and ordered an MRI. (AR at 201).

The MRI revealed a dehydrated disc at T11–12 and a dehydrated bulging disc at L3–4. (AR at 199). On July 15, 1998, Dr. Brocker reported that the results of a bone scan Plaintiff had in June were relatively unremarkable and were not suggestive of reflex sympathetic dystrophy although he did find that Plaintiff suffered from chronic pain. (AR at 144, 198). He continued Plaintiff on Neurontin and added Flexiril, and described Plaintiff's progress by stating that he was worsening and continuing to suffer. Dr. Brocker continued to report that Plaintiff was worsening in August and September, 1998 and also diagnosed him in these months with cervical radiculopathy, cervical disc displacement and lumbar disc displacement, lumbar radiculopathy with chronic benign pain and intractable pain. (AR at 196–197). Dr. Brocker also recommended physical therapy with traction and aqua therapy at this time. (AR at 195–196). In November, 1998, Dr. Brocker again reported that Plaintiff was worsening and recommended a right ankle brace, deep heat ultrasound and massotherapy in addition to his other medications and therapies. (AR at 221). One month later, Dr. Brocker again reported that Plaintiff was worsening, noting specifically that the clots and neck were better, but the lower back was worsening.

(AR at 222). He recommended that Plaintiff try to avoid lifting, bending or twisting.

Plaintiff was examined on October 30, 1998 by Dr. Ali Akbar Maknoon, M.D. at the request of the Social Security Administration. (AR at 202–204). Dr. Maknoon reported that Plaintiff had a history of chronic left shoulder pain that was mildly symptomatic and produced a slight limitation of internal rotation at the time of the examination, a history of chronic neck pain that did not reveal any objective neurological findings but did produce slight stiffness with mild paraspinal muscle spasm at the time of the examination, a history of blood clotting in the right leg that was not then producing any edema or swelling, and a history of chronic ankle pain dating to Plaintiff's injury at the age of sixteen that was symptomatic at the time of the examination. (AR at 203).

A residual functional capacity assessment was also completed by a reviewing physician. (AR at 206–212). Dr. Dulabon, Jr., M.D. reported that Plaintiff could occasionally lift 20 pounds, could frequently lift ten pounds, could stand and/or walk at least two hours in an eight-hour workday, could sit for a total of about six hours in an eight-hour workday, had an unlimited ability to push and/or pull, and had no postural manipulative, visual, communicative, or environmental limitations. (AR at 206–212).

The record also contains medical records from Northwest Medical Center dating from March 29, 1992 to June 20, 1998 and from Lisa A. Failor, DPM dating from April 24, 1998 to June 1, 1998. (AR at 134–181, 226–258, 131–133, 217–220). An MRI of Plaintiff's cervical spine in February, 1994 revealed broadly based disc herniation at C5–6 which narrowed CSF spaces, impressed on the cord and lead to canal stenosis. (AR at 180). Mild to moderate bilateral foraminal stenosis was also

seen at this level. In April, 1998, Plaintiff had a normal right lower extremity nerve conduction EMG study that revealed no evidence of neuropathy, axonopathy or radiculopathy. (AR at 153). Doppler venous sonographies of the left lower extremity in February and April, 1998 revealed a small amount of ethnogenicity within the common femoral vein that was consistent with thrombus. (AR at 151). Demineralization of the right ankle was revealed on May 5, 1998 (AR at 148). An MRI of this ankle revealed a subtle irregularity of the articular surface of the anterior tibial margin that could have been an area of osteochondritis. (AR at 147). A physical exam performed in May, 1998 revealed hyperesthesia in the arch of the right foot and some decreased sensation to gross touch of the first and second toes. (AR at 140).

On April 24, 1998, Failor reported that a physical exam of Plaintiff revealed a very abnormal gait and barely palpable d.p. and non-palpable p.t. pulses. (AR at 133). He was given Capsaicin for his neuritis. (AR at 133). The following month, Failor recommended that Plaintiff begin at the Pain Clinic as soon as possible, continue with physical therapy in the interim, continue with the Capsaicin and wear the accommodative shoe wear he had acquired. (AR at 132).

At the administrative hearing held on February 8, 1999, Plaintiff testified that he could barely get up in the morning, and was done for the day by 11 a.m. or 12 p.m. due to pain and stiffness. (AR at 40). He stated that he had pain in his right leg, calf and ankle and left shoulder and that the pain in one location could not be described as worse than the pain in the others; it was essentially all over. Plaintiff also experienced pain in his right hand and poor grip strength as a result, and his left shoulder and arm were almost entirely

useless. (AR at 41). He dropped things approximately two to three times a day. When asked about his driving habits, Plaintiff replied that he drives only eight miles three times a week to go to physical therapy, and that his wife and daughter did his shopping and cleaning. He felt that his pain medication helped to some degree but did not take a significant edge off of his pain. (AR at 43). The pain was described as sharp, stabbing, aching, constant and aggravated by movement. He was able to walk approximately eight feet before wanting to sit down. He could only sleep for half an hour to 45 minutes at a time and then would wake up with pain. (AR at 50). During the day, Plaintiff spent most of his time laying on the couch or bed or sitting in a chair, although he could generally only sit for about five minutes before experiencing pain; the best position for him was laying flat on his back. (AR at 52). He had muscle spasms that lasted from half an hour to two or three hours. Plaintiff also stated that he was trying to wean himself from his cane, but that he would frequently fall without it because his leg would give out. (AR at 53).

The ALJ asked the vocational expert to assume that a hypothetical claimant with Plaintiff's educational and work background was able to perform work at the light exertional level but could only occasionally make postural movements and required a sit/stand option. (AR at 56–57). The vocational expert testified that such a claimant could perform a number of jobs existing in significant numbers in the national economy, including assembler, packager and unarmed security guard positions. When asked to further assume that the hypothetical claimant could do no bending or twisting and could not be exposed to any excessive weather changes or heat, the vocational expert replied that the range of work such a person could perform

was the same. The ALJ further asked the expert to assume that the claimant had to spend at least two hours of each work day in a reclined position. (AR at 58). With this additional restriction, the vocational expert testified that such an individual could perform no jobs in the national economy on a sustained competitive basis. He also testified that a hypothetical restriction requiring a person to go to doctor's appointments three times a week would erode the number of positions the individual could perform. (AR at 58). Plaintiff's attorney asked no questions of the vocational expert.

The ALJ rendered his decision on February 26, 1999. He found that Plaintiff had not engaged in any substantial gainful activity since the alleged disability onset date of February 17, 1998 and that Plaintiff suffered from three severe impairments: a back disorder, a blood clot in the right leg, and an ankle injury. (AR at 16–17). It was determined that although severe, none of these impairments met or equaled the criteria of any of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1. In evaluating Plaintiff's residual functional capacity, the ALJ determined that Plaintiff's daily activities, including taking care of his personal needs, cooking, attending physical therapy and visiting with friends and relatives, were not indicative of someone who was totally disabled. (AR at 21). The ALJ also found that Dr. Brocker's reports were internally inconsistent in that they found Plaintiff's major systems to be unchanged while also finding that Plaintiff was worsening; the ALJ gave controlling weight to Dr. Andres' reports.

It was next determined that Plaintiff was limited to light work and therefore could not return to any of his past positions. (AR at 23). The ALJ relied on the testimony of the vocational expert to con-

clude that Plaintiff could make vocational adjustments and perform jobs existing in significant numbers in the national economy at the light exertional level. In this regard, the ALJ stated that the vocational expert's answers to the effect that Plaintiff could not work were in response to hypothetical questions that were more restrictive than warranted by the evidence. The ALJ also stated that Plaintiff's counsel posed hypothetical questions that were not consistent with the Plaintiff's limitations and therefore were not determinative. (AR at 24).[2]

## II. STANDARD OF REVIEW

A court must affirm the determination of the Commissioner if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is not a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938); *see also Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). It is considered to be less than a preponderance of the evidence but more than a mere scintilla. *See Richardson,* 402 U.S. at 401, 91 S.Ct. 1420; *Jesurum v. Sec'y of the United States Dept. of Health and Human Servs.,* 48 F.3d 114, 117 (3d Cir.1995).

 The Third Circuit Court of Appeals has provided further guidance on the substantial evidence analysis. For instance, "[a] single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.

Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (*e.g.,* that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion." *Kent v. Schweiker,* 710 F.2d 110, 114 (3d Cir.1983). Where there is conflicting evidence, the Commissioner "must adequately explain in the record his reasons for rejecting or discrediting competent evidence." *Sykes v. Apfel,* 228 F.3d 259, 266 (3d Cir.2000) (*quoting Benton v. Bowen,* 820 F.2d 85, 88 (3d Cir.1987)). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" *Cotter v. Harris,* 642 F.2d 700, 705 (3d Cir.1981) (*quoting Dobrowolsky v. Califano,* 606 F.2d 403, 407 (3d Cir.1979)).

## III. DISCUSSION

In order to establish SSI eligibility, a claimant must be unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an individual meets this definition. *See* 20 C.F.R. § 404.1520. In *Plummer v. Apfel,* 186 F.3d 422, 428 (3d Cir.1999), the Third Circuit set forth the process as follows:

> In step one, the Commissioner must determine whether the claimant is current-

---

**2.** This statement is factually incorrect. Plaintiff's counsel posed no hypothetical questions to the vocational expert. The additional ques-

tions asked were posed by the ALJ himself. (AR at 56–58).

ly engaging in substantial gainful activity. If a claimant is found to be engaged in substantial activity, the disability claim will be denied. In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. If the claimant fails to show that her impairments are "severe," she is ineligible for disability benefits.

In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work. The claimant bears the burden of demonstrating an inability to return to her past relevant work.

If the claimant is unable to resume her former occupation, the evaluation moves to the final step. At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. The ALJ must show there are other jobs existing in significant numbers in the national economy the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled. The ALJ will often seek the assistance of a vocational expert at this fifth step.

This case was resolved at the fifth step. Plaintiff argues that the Commissioner erred in three respects: 1) assessing his credibility; 2) evaluating the medical evidence; and 3) evaluating the vocational expert's testimony. We will address the second argument first.

### A. Evaluation of the Medical Evidence

Plaintiff's first argument is that the ALJ erred in his assessment of the medical evidence; specifically, he argues that the ALJ erroneously declined to give Dr. Brocker's opinion controlling weight. The ALJ did not explicitly specify the weight he attributed to Dr. Brocker's opinion that Plaintiff was worsening, although it appears that he rejected it altogether. (AR at 20).[3] Plainly, the ALJ did not give it controlling weight or great weight. He found it to be inconsistent with the physician's conclusion that Plaintiff's major systems were stable, and specifically criticized Dr. Brocker for not explaining this inconsistency in his examination notes. *Id.* Later in his opinion, the ALJ purported to give controlling weight to Dr. Andres' opinion, stating that "the State Agency physicians support the conclusion of Dr. Andres that the claimant should return to work." *Id.*

An "ALJ may reject a treating physician's opinion on the basis of contradictory medical evidence, and may afford a medical opinion more or less weight depending upon the degree to which supporting explanations are provided and whether the treating doctor is a specialist."

---

**3.** Dr. Brocker did not explicitly comment on Plaintiff's ability to work, although it is notable that prior to seeing Dr. Brocker and falling in June, 1998, Plaintiff's family doctor, Dr. Andres, signed a disability form keeping him out of work until July 1, 1998. (AR at 190). Plaintiff first saw Dr. Brocker on June 17, 1998, and he first reported that Plaintiff was worsening on July 15, 1998. (AR at 198) ("He is worsening and continuing to suffer."). In this context, the import of Dr. Brocker's opinion is significant.

*Frankenfield v. Bowen,* 861 F.2d 405, 408 (3d Cir.1988); 20 C.F.R. § 404.1527(d). A treating physician's medical opinion is to be given controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 404.1527(d)(2). Even when a treating physician's opinion is not given controlling weight, it is entitled to "great weight, especially when [it] reflect[s] expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Morales v. Apfel,* 225 F.3d 310, 317–18 (3d Cir.2000) (*quoting Plummer v. Apfel,* 186 F.3d 422, 429 (3d Cir.1999)). Finally, in rejecting a treating physician's opinion, an ALJ is not permitted to make speculative inferences from medical reports; the ALJ must reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" as opposed to his or her own credibility judgments, speculation or lay opinion. *Id.* at 318 (*quoting Plummer,* 186 F.3d at 429).

Each of Dr. Brocker's examination notes with the exception of the first note (which lists swelling of the feet, ankles, and hands, joint pain, stiffness and swelling, weakness of muscles and joints, muscle pain or cramps, difficulty walking, numbness and phlebitis in the systems review) provides in part:

**Complete Review of Systems:** There was no constitutional changes and no recent vision changes, No hearing changes. No cardiovascular difficulties, No breathing problems. No genitourinary difficulties. *No musculoskeletal problems other than mentioned above.* No skin problems. No endocrine difficulties. No psychiatric difficulties. No hematological or bleeding problems. No allergic or lymphatic difficulties.

(AR at 195, 197, 198, 221, 222) (emphasis added).

We have substantial difficulty understanding how this section could be seen as inconsistent with Dr. Brocker's conclusion that Plaintiff's musculoskeletal problems were worsening. It plainly indicates that Plaintiff's examination revealed musculoskeletal problems, and these problems are extensively discussed in other sections of Dr. Brocker's detailed examination notes that the ALJ curiously neglects to mention. For example, the examination note of November 6, 1998 also provides in part:

**History:** Mark does have a little bit of a clot in his right inguinal area. His family doctor, Dr. Andres in Oil City did stop the Plavix and started him on Coumadin and he does have a little bit of a stomach ulcer, and his family doctor also has him on Prilosec for that, as is appropriate. He also still does have a problem in his neck. The neck has been progressing, it was previously involving just the left hand, now the right hand is being involved also. He does have an MRI that does show he has a disc herniation at C5–C6, impinging on the C6 nerve root and going to both sides as would be expected from the disc. The disc is central left, a little bit more affecting the left, but many eventually affect the right side as much, as is occurring. Physical therapy is going fair, but traction bothers him more than any benefit. In the whirlpoolor aquatherapy is reasonable, so we will try to help him to continue with that. He is still suffering, trying to use the Oxycontin wisely, he is aware that it is addicting, but he needs it for quality of life. Neurontin, he is not sure if it is helping, but no side effects. He has adapted to Flexiril, it is no longer of any benefit. It is hard to go up and down stairs, he must use a

railing only. He certainly cannot do any lifting, bending or twisting and would really pay with increased pain if he does those type of activities.

**Examination:** Shows a positive Spurling to the neck base, going over to the left and right now. He has bilateral C6 hypalgesia all the way down to the fingertips. A little bit worse on the left than the right. There is still a decreased left brachiodialis reflex and triceps, but now there is a decreased right brachioradialis reflex. He still has right sided straight leg raising positive, dysesthesia of the whole right leg, but more prominently of the right L5 dermatome. He has right sided foot drop and right S1 hypalgesia in addition. Examination of the heart, lungs, and abdomen was devoid of pathological lesions.

**Progress of Patient:** He is worsening with the clot to right inguinal area and the pain in the right leg is worse, and things are progressing in the right and left arm.

(AR at 221).

■ We have little difficulty concluding that the ALJ's decision to discount or reject Dr. Brocker's opinion is not supported by substantial evidence. The ALJ's only explanation for criticizing it, that it is inconsistent with the doctor's conclusion that Plaintiff's major systems are stable, appears to be based solely on the ALJ's own conclusion that someone suffering from musculoskeletal pain would necessarily also have abnormal hearing, vision, cardiovascular and/or other systems. This is an impermissible lay opinion that does not adequately address the pertinent issues of whether Dr. Brocker's opinion is well-supported and whether it is consistent with the other substantial record evidence. Notably, Dr. Brocker had treated Plaintiff for eight months at the time of the administrative hearing, is a specialist, and his conclu-

sions regarding Plaintiff's position were accompanied by detailed examination notes explaining his conclusions. Notwithstanding these facts, the ALJ fails to make explicit the weight he allots to Dr. Brocker's opinion and to adequately explain his reasons for allotting the opinion such weight. It is clear that "[w]here competent evidence supports a claimant's claims, the ALJ must explicitly weigh the evidence and explain a rejection of the evidence." *Schaudeck v. Comm'r of Soc. Sec.,* 181 F.3d 429, 435 (3d Cir.1999), (*citing Dobrowolsky v. Califano,* 606 F.2d 403, 407 (3d Cir.1979); *Benton v. Bowen,* 820 F.2d 85, 88 (3d Cir.1987)).

The ALJ also purports to give controlling weight to the clinical findings, opinions and assessments of the Plaintiff's family doctor, Dr. Andres, noting that the "state Agency physicians support the conclusion of Dr. Andres that the claimant should return to work." *Id.* We observe that the first treatment note from Dr. Andres is dated February 17, 1998, which is four months earlier than Dr. Brocker's first note, although the latest note from Dr. Andres is dated September 11, 1998, almost a full five months before the date of the administrative hearing; Dr. Brocker's last examination note of record is dated January 9, 1999.

■ We find that the ALJ substantially mischaracterized Dr. Andres' opinion. The ALJ mentions parts of Dr. Andres' notes that, when viewed in context, are selective and not fairly representative of his findings as a whole. For instance, the ALJ mentions that Dr. Andres considered that Plaintiff may have been exaggerating his symptoms at a visit in June, 1998 and that Dr. Andres felt Plaintiff would be able to return to work at "some point in time" in April, 1998. (AR at 19). The ALJ neglects to mention, however, that Dr. Andres kept Plaintiff out of work from the

end of March till July 1, 1998 and that he thereafter recommended that Plaintiff continue with Dr. Brocker for treatment of his chronic back and neck pain. In a treatment note dated August 11, 1998, Dr. Andres stated in part that:

> [h]e is still having chronic pain. I talked to him about that. It seems like the best course of action is to have his neurosurgeon work on his back pain and neck pain. He should see an orthopod for his shoulder pain and I want to work on the DVT pain. Since being on the Plavix, his leg has slightly increased in size more than before and he has had more pain ... He is getting a PT on Saturday and then every Tuesday thereafter to see if we need to make any other changes. Other than that his physical exam looks pretty good. We are going to check the size of his thigh which is 54 cm mid-thigh right now to see if it decreased at all with the Coumadin Therapy.

(AR at 185). The final treatment note from Dr. Andres, dated September 15, 1998, provides in its entirety that Plaintiff is "not getting Better—." *Id.*

Fundamentally, Dr. Andres does not opine that Plaintiff is able to work in any record document; his hopeful comments about Plaintiff's future abilities cannot be read as an indication of Plaintiff's actual capacity. Furthermore, Dr. Andres' later reports, in contrast to his earlier ones, cast no doubt on the veracity of Plaintiff's complaints and recommend that Plaintiff continue seeing Dr. Brocker. It is also not clear to us that the State Agency physicians' reports can be read as indicating that Plaintiff is able to work. In the face of conflicting evidence, an ALJ is permitted to choose whom to credit but may not "reject evidence for no reason or the wrong reason." *Cotter v. Harris,* 642 F.2d 700, 707 (3d Cir.1981). Here, however, it is not readily apparent that the medical evidence is in conflict, and the ALJ has not adequately explained his conclusion that it is.

■ In sum, an ALJ is required to explicitly weigh all relevant, probative and available evidence and to provide an explanation for any evidence that he rejects. *Adorno v. Shalala,* 40 F.3d 43, 47–48 (3d Cir.1994); *see also Dobrowolsky v. Califano,* 606 F.2d 403, 407 (3d Cir.1979); *Plummer v. Apfel,* 186 F.3d 422, 429 (3d Cir. 1999). Because the ALJ failed to do so adequately in this case, we will remand.

### B. Evaluation of Plaintiff's Credibility

Plaintiff also challenges the ALJ's decision to not fully credit his testimony. In his opinion, the ALJ found that Plaintiff's activities of daily living were not "indicative of someone alleging a totally disabling impairment." (AR at 21). The ALJ also found that Plaintiff's statements regarding the ineffectiveness of his medications were not entirely credible because he continued to take these medications and often reported to his physicians that they were providing relief from his pain. *Id.*

■ An ALJ is required to "give serious consideration to a claimant's subjective complaints of pain, even where those complaints are not supported by objective evidence." *Mason v. Shalala,* 994 F.2d 1058, 1067 (3d Cir.1993) (*citing Ferguson v. Schweiker,* 765 F.2d 31, 37 (3d Cir.1985)). It is not required that objective evidence of the pain itself exist, although there must be objective evidence of some condition that could reasonably produce the pain. *Green v. Schweiker,* 749 F.2d 1066, 1070–71 (3d Cir.1984). In situations where there is medical evidence supporting a claimant's complaints of pain, the "complaints should then be given 'great weight' and may not be disregarded unless there exists contrary medical evi-

dence." *Mason*, 994 F.2d at 1067–68 (citing *Carter v. Railroad Retirement Board*, 834 F.2d 62, 65 (3d Cir.1987); *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir.1985)). Further, the ALJ's "determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear ... the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Schwartz v. Halter*, 134 F.Supp.2d 640, 654 (E.D.Pa.2001) (quoting Social Security Ruling 96–7p, 1996 WL 374 (1996) and citing *Schaudeck v. Commr. of Soc. Sec. Admin.*, 181 F.3d 429, 433 (3d Cir.1999)).

 Here, the record is replete with evidence of conditions that could reasonably produce Plaintiff's pain, for example Dr. Brocker's diagnoses. Our conclusion on the medical evidence issue is therefore relevant here; in light of our determination that the ALJ did not adequately consider the medical evidence, we cannot find that the ALJ adequately considered Plaintiff's subjective complaints of pain. *See Mason*, 994 F.2d at 1068 ( ... "the ALJ cannot be assumed to have given appellant's subjective complaints of pain the substantial weight they are due—particularly since the complaints were deprived of the weight of substantiation by medical evidence."). One relevant factor in evaluating a claimant's subjective complaints of pain is "treating and examining physicians' opinions regarding the credibility and severity of the claimant's subjective complaints." *Schwartz*, 134 F.Supp.2d at 654 (citing SSR 96–7p). If

the ALJ had credited Dr. Brocker's opinion, his analysis of Plaintiff's credibility may have been different and vice versa. *Id.* at 655.

We are also troubled by the vagueness of the ALJ's explanation. In his opinion, Plaintiff's daily activities are referenced in broad brush, but no connection is drawn between the Plaintiff's ability to, for example, drive eight miles and the ALJ's conclusion that Plaintiff could engage in more physical activities than he claimed. *See id.* at 655 n. 13 ("The ALJ did not explain how Schwartz's admission to these limited activities persuaded him to believe that Schwartz could sit, stand, or walk for longer than he professed he could."). Accordingly, we will remand on this issue as well.

### C. *Evaluation of the Vocational Expert Testimony*

Plaintiff's final argument is that the ALJ erred in his assessment of the vocational expert's testimony. A vocational expert's testimony may be relied upon as substantial evidence when it is given in response to a hypothetical question that "fairly set[s] forth every credible limitation established by the physical evidence." *Plummer v. Apfel*, 186 F.3d 422, 431 (3d Cir. 1999). In this case, the hypothetical relied on by the ALJ is apparently the one incorporating the following: a restriction to work at the light exertional level; only occasional postural movements; a sit-stand option; no bending or twisting; and no extreme temperatures. (AR at 56–57).[4] Given our disposition on the medical evidence and credibility determinations, however, we cannot determine at this point

---

**4.** We say "apparently" because the ALJ also asked additional hypothetical questions that incorporated a need to be in a reclined position for two hours every workday and a need to attend doctor's appointments three times a week. (AR at 58). The vocational expert testified that the first restriction would pre-

clude the ability to work and that the second would erode the number of available jobs. In his opinion, the ALJ attributed some hypotheticals to Plaintiffs' counsel, although all of the hypotheticals were in fact asked by the ALJ himself.

that this hypothetical fairly set forth all of Plaintiff's physical limitations. The ALJ will necessarily need to reconsider the adequacy of the hypothetical question he relied on after reconsidering the medical evidence and Plaintiffs' subjective complaints of pain.

### D. Remand or Reversal?

It remains for us to decide whether we will remand the case for further administrative proceedings or reverse and direct an award of benefits. The Third Circuit has held that the decision to award benefits "should be made only when the administrative record of the case has been fully developed and when substantial evidence in the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny v. Harris,* 745 F.2d 210, 222 (3d Cir.1984). In this instance, we find that a remand is appropriate. The ALJ is directed to reconsider the medical evidence, Plaintiff's subjective complaints of pain and the vocational expert testimony in light of this opinion.

### ORDER

AND NOW, this ___ day of April, 2002, for the reasons stated in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment [Doc. No. 7] is GRANTED to the extent that we are remanding, and Defendant's Motion for Summary Judgment [Doc. No. 10] is DENIED.

This matter is REMANDED to the ALJ for proceedings consistent with the foregoing opinion.