**Kimberly N. SANDERSON, Plaintiff,**

v.

**CONTINENTAL CASUALTY CORPORATION, et al., Defendants.**

**No. C.A. 01–606 GMS.**

United States District Court, D. Delaware.

Feb. 25, 2003.

Order Denying Reconsideration Aug. 19, 2003.

Herbert G. Feuerhake, Wilmington, DE, for plaintiff.

Robert D. Goldberg, Biggs & Battaglia, Wilmington, DE, Derek B. Yarmis, Funk & Bolton, for defendant.

## MEMORANDUM AND ORDER

SLEET, District Judge.

### I. INTRODUCTION

On September 7, 2001, the plaintiff, Kimberly N. Sanderson ("Sanderson") filed the above-captioned action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* In this action, she seeks to recover long-term disability benefits which she claims are due under a policy of insurance issued by Continental Casualty Company ("Continental") to her employer, Rhodia, Inc. ("Rhodia").[1]

Presently before the court are the parties' cross-motions for summary judgment. For the following reasons, the court will grant in part and deny in part the defendants' motion. It will deny Sanderson's motion.

### II. STANDARD OF REVIEW

The court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Boyle v. County of Allegheny, Pennsylvania,* 139 F.3d 386, 392 (3d Cir.1998). Thus, the court may grant summary judgment only if the moving party shows that there are no genuine issues of material fact that would permit a reasonable jury to find for the non-moving party. *See Boyle,* 139 F.3d at 392. A fact is material if it might affect the outcome of the suit. *Id.* (citing

---

**1.** Rhodia Inc. was dismissed from this action, without prejudice, on January 31, 2002.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue is genuine if a reasonable jury could possibly find in favor of the non-moving party with regard to that issue. *Id.* In deciding the motion, the court must construe all facts and inferences in the light most favorable to the non-moving party. *Id.; see also Assaf v. Fields*, 178 F.3d 170, 173–174 (3d Cir. 1999).

## III. BACKGROUND

### A. The Policy

Since November 1, 1999, Continental has insured Rhodia's long-term disability plan (the "Policy"). Additionally, the Policy grants Continental the discretion to determine eligibility for benefits and to interpret its terms and provisions. Specifically, the Group Long Term Disability Certificate contained in the Policy provides that: "[w]hen making a benefit determination under the policy, [w]e have discretionary authority to determine [y]our eligibility for benefits and to interpret the terms and provisions of the policy".[2] Under the terms of the Policy, the obligation to pay long-term disability benefits to eligible participants rests with Continental. *See* Policy at 1.

As such, Continental has the sole authority to administer the claims process and determine whether long-term disability benefits are payable under the Policy. According to the Policy, the terms "disabled" and "disability" are defined as meaning the applicant "satisf[ies] the Occupation Qualifier or the Earning Qualifier as defined [therein]." *Id.* at 8. The Policy defines "Occupation Qualifier" in relevant part as follows:

"*Disability*" means that during the *Elimination Period* and the following 24 months, *Injury* or *Sickness* causes physical or mental impairment to such a degree or severity that *You* are:

1. continuously unable to perform the *Material and Substantial Duties of Your Regular Occupation;* and

2. not working for wages in any occupation for which *You* are or become qualified by education, training, or experience.

Policy at 8.[3]

The Proof of Disability section indicates that an applicant is required, *inter alia*, to provide the following information: "[o]bjective medical findings which support [your disability]. Objective medical findings include but are not limited to tests, procedures, or clinical examinations standardly accepted in the practice of medicine, for [your] disabling conditions." Policy at 15. Additionally, an applicant is required to supply information concerning "[t]he extent of [your disability], including restrictions and limitations which are preventing [you] from performing [your regular occupation]." *Id.*

### B. Sanderson's Claim

Sanderson became employed by Rhodia in 1992 as a Health, Safety, and Environmental Manager at a facility located in Marcus Hook, Pennsylvania. She began experiencing pain symptoms in 1994 and was diagnosed with conditions relating to rheumatoid arthritis in October 1999. She applied for short-term disability benefits from Rhodia on February 28, 2000. Rhodia granted these benefits beginning on

---

**2.** The term "we" is defined in the Policy's glossary as referring to Continental. *See* Policy at 8.

**3.** The term "Earnings Qualifier" is not at issue in this case. The court will, therefore, omit its definition from this opinion.

March 1, 2000 and ending on August 31, 2000.

On June 14, 2000, Sanderson submitted an application for long-term disability benefits to her employer. On June 23, 2000, Rhodia's Benefits Services Representative completed the "Employer's Statement" portion of the application and forwarded the materials to Continental.

Continental received her benefits application and commenced an investigation to evaluate her eligibility. Rica Hall ("Hall"), a Disability Specialist, and Nancy Heidrich ("Heidrich"), a Registered Nurse, reviewed Sanderson's application and initiated an investigation of the claim. Hall and Heidrich reviewed the documents contained in, and attached to, her application. According to Continental, their evaluation included a review of the Employer's Statement; the Employee's Statement and attachments; the Physician's Statement, which was completed by Dr. Nancy G. Murphy ("Dr.Murphy"); Dr. Kenneth Brumberger's Magnetic Resonance Imaging reports concerning Sanderson's wrist and right hand; Dr. Peter Townsend's ("Dr.Townsend") May 9, 2000 letter indicating a recommendation of "carpal tunnel release" surgery on each wrist; February 2, 2000, March 16, 2000, and May 16, 2000 lab reports; and an occupational Physical Demands Analysis completed by Joe Vogt, Rhodia's Plan Manager at the Marcus Hook, Pennsylvania facility. Further, on July 14, 2000, Hall conducted a Claimant Interview with Sanderson in order to provide her with an opportunity to personally discuss the conditions at issue.

On July 20, August 18, and August 23, 2000, Hall and Heidrich received updated copies of Sanderson's medical file from Dr. Townsend's office, including reports concerning her carpal tunnel release surgery, and a July 14, 2000 notion indicating "S/P carpal tunnel release with no complications

and resolution of her paresthesias." Dr. Townsend further noted that Sanderson was "[d]oing quite well with relief of pre-operative symptoms."

On August 4, 14, 30, and 31, 2000, Hall and Heidrich obtained updated copies of Sanderson's medical file from Dr. Murphy's office. On August 21, 2000, Continental received Sanderson's Statement of Daily Activities form and included it with her claim file. On August 22, 2000, Hall and Heidrich received a copy of Sanderson's medical file from Dr. Frank Falco's office. On September 5, 2000, Continental received Dr. Charles A. Esham's ("Dr.Esham") letter, dated August 30, 2000, in support of Sanderson's application for disability benefits. The letter was directed to Hall, who reviewed it and included it in Sanderson's claim file.

By way of letter dated September 7, 2000, Continental informed Sanderson of its initial decision to deny her claim. In the letter, Hall summarized the materials she and Heidrich had reviewed. She also reiterated the relevant portions of the Policy relied upon to evaluate Sanderson's claim. Among other things, Hall reported the following conclusion:

> after a thorough review of the information in our file, we have found that the medical information in our file does not support a functional impairment that would prevent you from performing your occupation. Because you do not meet the definition of disability, your claim has been denied.

September 7, 2000 Letter.

After receiving the September 7, 2000 letter, Sanderson sought reconsideration of Continental's decision to deny her application for long-term disability benefits. She also retained an attorney.

By way of letter dated November 3, 2000, Hall notified Sanderson that Conti-

nental had received her request to appeal the September 7, 2000 determination. Hall informed Sanderson that: [a]ccording to your letter, additional information will be coming. Upon receipt of this information, a thorough review will take place. If we find that the information "provided does not change our decision to deny the claim, we will forward the claim to the Appeals Committee."

Also on November 3, 2000, Sanderson submitted a letter to Hall outlining her position regarding Continental's denial of her claim. Attached to the letter were various documents that were already included in Sanderson's claim file. New medical documentation attached to the letter and reviewed by Hall and Heidrich included Dr. James Newman's ("Dr.Newman") October 6, 2000 letter to Dr. Esham. Sanderson also included an imaging study conducted by Dr. Thomas W. Fiss, Jr., which indicated negative studies of the hand and substantially negative studies of the feet, as well as noting no significant arthritic changes; and internal Rhodia e-mail dated September 25, 200; and Dr. Esham's file notations dated March 22, 2000 and June 21, 2000.

Also attached to Sanderson's November 3, 2000 letter was an evaluation conducted by Dr. Alan Ken Matsumoto ("Dr.Matsumoto"), a rheumatologist from the Johns Hopkins Rheumatology Clinic. Dr. Matsumoto's letter indicates that he examined Sanderson on October 3, 2000 and concluded the following:

at the present situation, I do not think she has active inflammatory changes in her joints, but these changes might be suppressed by her therapy.

The most remarkable aspect of her musculoskeletal examination is her extreme tenderness not only in the joint areas but in the soft tissue areas as well. She is tender to even very light palpation in the soft tissue areas.

By letter dated November 30, 2000, Sanderson submitted a letter from Dr. Murphy in support of her disability application. Hall reviewed this letter and included it in Sanderson's claim file.

On December 10, 2000, Dr. Eugene Truchelut ("Dr.Truchelut") conducted a peer review of Sanderson's claim file on Continental's behalf. He served as an independent consultant who had no stake in the outcome of the claim. The review procedure constituted an assessment of whether Sanderson's medical history could preclude her from fulfilling the physical demands of her occupation. As part of his peer review, Dr. Truchelut assessed the rheumatology reports submitted by Dr. Newman and Dr. Matsumoto. He reported the following determinations:

There [were] some contradictions between Dr. Newman's and Dr. Matsumoto's finding, which were only one day apart, but they seem to agree that active inflammatory rheumatoid arthritis was not present at that time. There is a suggestion here that [Sanderson's] medication regimen may have been responsible for that, i.e., she finally was achieving control of her RA with improvement, and her other widespread symptoms were disproportionate to this status.

Based on this information, Dr. Truchelut concluded that, with the exception of medium-to-heavy lifting and excessive use of her hands, "it would seem that the claimant would be able to perform the job requirements as stated on the employer's physical demands analysis form...."

By letter dated December 14, 2000, Hall notified Sanderson that Continental had again denied her claim upon reconsideration. In the letter, Hall wrote: "[w]e have reviewed the additional information submitted. After further evaluation, we are

unable to revise our decision. The information in out file does not support a functional impairment that would prevent Ms. Sanderson from performing the duties of her occupation. We have forwarded the file to the Appeals Committee."

In a letter dated January 18, 2001, Sanderson notified Hall of her approval for receipt of Social Security Disability Income. Hall forwarded the letter to the Appeals Committee.

Continental's Appeals Committee conducted a review of Sanderson's claim file to determine her eligibility for long-term disability benefits. Doris Gloss ("Gloss"), a Registered Nurse, acted as the Appeals Committee Member responsible for appellate review of Sanderson's claim. By letter dated January 19, 2001, Gloss informed Sanderson that the Appeals Committee upheld the denial of the claim "after comprehensive review of the medical evidence." In the notification letter, Gloss summarized the records reviewed on appeal and informed Sanderson that she had "exhausted all administrative remedies offered by the appeals process." Ultimately, Continental found that "the medical evidence does not support a functional impairment to preclude Ms. Sanderson from performing her occupation as a Health and Safety Environmental Engineer and Plan Facilitator."

## IV. DISCUSSION

### A. Continental's Motion for Summary Judgment

#### 1. Heightened Arbitrary and Capricious Standard

When considering a plan administrator or fiduciary's denial of benefits under ERISA, district courts are generally instructed to employ *de novo* review. *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103

L.Ed.2d 80 (1989). However, where plan terms grant discretion to the plan administrator or fiduciary to determine a claimant's eligibility for benefits, the decision is subject to review under an "arbitrary and capricious" standard (i.e., a determination of whether the plan administrator abused its discretion in reaching its decision). *See Mitchell v. Eastman Kodak Co.,* 113 F.3d 433, 437 (3d Cir.1997). Where discretion is reserved, the court may overturn the decision only if it is " 'without reason, unsupported by substantial evidence or erroneous as a matter of law.' " *Abnathya v. Hoffmann–La Roche, Inc.,* 2 F.3d 40, 45 (3d Cir.1993) (citations omitted). However, where the administrator's decision is potentially clouded by a conflict of interest, such as where a plan administrator also funds the plan it administers, the conflict must be considered in assessing the amount of deference to be given to the administrator's decision. *See Pinto v. Reliance Standard Life Ins. Co.,* 214 F.3d 377, 387 (3d Cir.2000). Thus, in those circumstances, a modified or "heightened" arbitrary and capricious standard of review is appropriate. *See id.* at 390–92.

In the present case, the Policy at issue contains explicit language granting Continental discretion to determine eligibility for benefits. In particular, the Group Long Term Disability Certificate contained in the Policy provides that: "[w]hen making a benefit determination under the policy, [w]e have discretionary authority to determine [y]our eligibility for benefits and to interpret the terms and provisions of the policy." Policy at 6. The parties are in agreement that, given this explicit vesting of discretion to determine eligibility for benefits, this case does not fall under the line of authority establishing the *de novo* standard of review.

Furthermore, it is undisputed that Continental also funds the plan which it admin-

isters. Thus, a heightened arbitrary and capricious review is appropriate. *See Pinto*, 214 F.3d at 387.

### 2. Application to the Facts

 Under a standard arbitrary and capricious review, the court would be limited to determining whether the fiduciary's decision was without reason, unsupported by evidence, or erroneous as a matter of law. *See id.* Under the heightened arbitrary and capricious standard, however, the court need not give complete deference to the administrator's decision to deny benefits. *See id.* The court, therefore, must "look not only at the result—whether it is supported by reasons—but at the process by which the result was achieved." *Id.* The court may consider all evidence available to Continental during the entire appeals process. *See Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 440 (3d Cir.1997).

Applying a heightened arbitrary and capricious standard, the Third Circuit has suggested the presence of certain factors may indicate that less deference to the administrator's decision is warranted. *See Pinto*, 214 F.3d at 393 (discussing the "sliding scale"). Specifically, the administrator's decision-making process may not be entitled to deference if it reverses an earlier decision without receiving any additional medical information. *See id.* Additionally, the court need not accept the decision if the administrator uses a self-serving approach to the evidence that selectively relies upon the evidence that supports a denial of benefits, but rejects the evidence that supports the granting of benefits. *See id.* Finally, if the administrator appears unwilling to listen to advice from its staff that recommends continuation of benefits, the decision may be questioned. *See id.* at 394.

In the present case, the first and third factors are not at issue. Continental has never reversed its position on the issue of long-term disability benefits. Moreover, it has solicited additional information from Sanderson at every level of the appeals process. There is also no evidence in the record before the court that any of its staff opined that Sanderson was eligible for long-term disability benefits. Sanderson suggests, however, that the second factor, which instructs the court to consider whether the administrator was self-serving in its consideration of the evidence, is more problematic. According to her, this is so because Continental gave more weight to the evidence that favored the refusal of benefits, while giving her own treating physicians' reports little consideration. For the following reasons, the court must agree.

In support of her application for long-term disability benefits, and the following appeals, Sanderson submitted reports from her treating rheumatologist since 1999, Dr. Murphy; her primary care physician Dr. Esham; and rheumatologists Drs. Matsumoto and Townsend. In Dr. Murphy's November 28, 2000 letter, she stated that "[Sanderson] is disabled by the extreme, pervasive and chronic pain she experiences due to rheumatoid arthritis and fibromyalgia." She continued by noting that:

> [o]ne well-known rheumatologist, an expert in fibromyalgia, Dr. James Newman, diagnosed Ms. Sanderson with rheumatoid arthritis and fibromyalgia. Another expert in fibromyalgia at the Johns Hopkins Medical Center, Dr. Alan Matsumoto, also diagnosed Ms. Sanderson with fibromyalgia. While there is no objective "laboratory marker" for fibromyalgia, these doctors made their diagnoses based on diagnostic criteria, specifically the location of tender points, which are widely used by doctors.

Importantly, both of these experts in fibromyalgia have determined that Ms. Sanderson is physically disabled from working due to fibromyalgia. . . .

Moreover, in Dr. Newman's October 6, 2000 letter, he specifically noted that:

I think a reasonable second diagnosis is fibromyalgia. She certainly seems to have this syndrome on the basis of sleep disturbance, chronic fatigue, bruxism, temporomandibular joint dysfunction, irritable bowel syndrome and symmetric tender points. [ ] All in all, I think she has a severe disability due to these above problems.

Finally, in the "Assessments" section of his October 17, 2000 report, Dr. Matsumoto stated that he thinks "she fits into the category of a patient who has a fibromyalgia type of a presentation." Dr. Matsumoto did, however, note that he was unable to confirm a rheumatoid arthritis diagnosis due to the intensity of her treatment for that condition, and the changes her therapy may have caused.

Dr. Esham also submitted his medical file, as well as his August 30, 2000 medical opinion that Sanderson "continues to suffer from severe, unremitting, seronegative, rheumatoid arthritis which is worsening despite appropriate therapy with immunosuppressive agents." He further stated that "[s]he is in constant pain and now requires high doses of narcotics for relief. Her pain, stiffness and dependence on these drugs prevent her from resuming her former occupation. . . . [ ] Ms. Sanderson is completely disabled at this time."

By comparison, Continental relies heavily on the report of its peer review physician, Dr. Truchelut, as support for its decision. In his December 10, 2000 report, Dr. Truchelut noted that Drs. Newman and Matsumoto both felt that fibromyalgia explained the severity of Sanderson's symptoms. However, at no time did he himself make a determination of her disability due to fibromyalgia. His review was confined to her carpal tunnel syndrom and rheumatoid arthritis. Nor did he contact either Sanderson's treating physicians, or Sanderson herself. The emphasis on rheumatoid arthritis, with no substantive discussion of fibromyalgia, is evident in Continental's January 19, 2001 denial letter as well.

Additionally, Dr. Truchelut's paper review of Sanderson's case is troubling to the court because fibromyalgia is a condition which manifests itself primarily through clinical symptoms. Moreover, courts have noted that, while a diagnosis of fibromyalgia often turns on subjective information supplied by the patient, this does not render it any less a disability. See e.g. Mitchell v. Prudential Health Care Plan, 2002 WL 1284947, at *10, n. 6 (D.Del. June 10, 2002) (finding it non-fatal to the plaintiff's case that no objective tests verified the fibromyalgia diagnosis); Brenner v. Hartford Life and Acc. Ins. Co., 2001 WL 224826, at *4 (D.Md. Feb.23, 2001) (stating that both objective and subjective evidence may be used to establish a diagnosis of fibromyalgia, with greater deference being accorded to the evaluation of the treating physician). Under these circumstances, as Dr. Truchelut did not examine Sanderson personally, the court finds it suspect that Continental would have so easily accepted his report over the findings of Sanderson's treating physicians, and her own, albeit subjective, complaints of pain. See Skretvedt v. E.I. Dupont de Nemours and Co., 268 F.3d 167, 184 (3d Cir.2001) (recognizing that opinions of a claimant's treating physicians are entitled to substantial and at times even controlling weight).

Perhaps more troubling still is Continental's lack of explanation for its adverse

decision in the denial letters.[4] While Continental purported to summarize the information it had before it in those letters, it did not engage in any discussion of why it credited certain evidence, or how it reconciled Dr. Truchelut's analysis with that of Sanderson's own treating and examining physicians.[5] Continental argues somewhat disingenuously that, because the final denial letter "noted" that Drs. Newman and Matsumoto had opined that there were other factors contributing to the severity of the symptoms, such as fibromyalgia, it had adequately addressed the issue. Mentioning such findings, however, is far different from addressing them, or the effects that fibromyalgia may have had on Sanderson.

There is also evidence in the record that Continental was less than forthcoming with the evidence it chose to consider. For instance, in its summary of Dr. Newman's October 2, 2000 examination, Continental stated that, with regard to rheumatoid arthritis, he found that the "physical findings and the usual response to medication which she has taken is in contradistinction to the severity of her complaints." Denial Letter dated January 19, 2001. Continental does not, however, summarize Dr. Newman's ultimate conclusion at the end of the same paragraph, wherein he discusses fibromyalgia and its symptoms, concluding, "[a]ll in all, I think she has a severe disability due to these above problems." Dr. Newman's October 6, 2000 Letter to Dr. Esham. Such selective parsing of medical information with no explanation can only be described as suspect.

The court further notes that Continental has placed considerable weight on the alleged lack of "objective evidence" to support Sanderson's complaints of pain. Conversely, her subjective complaints of pain appear to have been entirely discounted. For instance, while Continental relied on Dr. Truchelut's report that Sanderson had experienced an improvement in range of motion and a decrease in the swelling such that she could return to her job, Continental did not consider how her subjective complaints of pain contradicted this conclusion.

The court finds this strong emphasis on objective evidence to the resulting exclusion of the subjective evidence to be improper. In making this determination, the court draws guidance from its earlier opinions, as well as from social security case law. *See e.g. Mitchell v. Prudential*

---

4. Continental asserts for the first time in its combined reply and answering brief (D.I.46) that it relied on Dr. Matsumoto's report as well as Dr. Truchelut's report in making its decision. The court will not accept such post-hoc reasoning, however, as the final denial letter itself does not indicate a special reliance on Dr. Matsumoto's report with regard to fibromyalgia. Indeed, the letter summarizes Dr. Matsumoto's findings in the same manner in which the findings of Dr. Murphy, for example, are described, yet Continental has never suggested that it relied on, or even considered, her reports. Moreover, the court finds it curious that, on the one hand, Continental suggests that it substantially relied on Dr. Matsumoto's report, but on the other hand, alludes to the question of whether he is even certified in the subspeciality of rheumatology.

*See* Continental's Combined Reply and Answering Brief (D.I.46) at 15, fn. 4.

5. The court finds it worth noting that Dr. James Hathaway, Rhodia's corporate medical director, also conducted a paper review of Sanderson's medical records. After this review, he opined that Continental had denied the claim unfairly. *See* September 25, 2000 e-mail from Dr. Hathaway to Lory Kondor. The court finds this position interesting because Dr. Hathaway had personal knowledge of Sanderson, her condition, and her position within the company. The court will, however, give Dr. Hathaway's position only minimal weight in this analysis as the record does not reflect precisely what information Dr. Hathaway reviewed.

*Health Care Plan,* 2002 WL 1284947, at *10 (D.Del. June 10, 2002); *Torix v. Ball Corp.,* 862 F.2d 1428, 1431 (10th Cir.1988) (noting that, although social security cases are not precedential in the ERISA context, they may be used for guidance.). The social security disability regulations require that subjective complaints of pain be given great weight as long as there is objective evidence of some condition that could reasonably produce such pain. *See Krizon v. Barnhart,* 197 F.Supp.2d 279, 289 (W.D.Pa.2002).

In the present case, there is objective medical evidence of fibromyalgia in the form of Sanderson's examining physician reports. While there is no "objective laboratory marker" for fibromyalgia, the illness is clinically diagnosed through a standardly accepted test in the practice of medicine—the trigger or tender point test. *See* Dr. Murphy's November 28, 2002 Letter. Here, Dr. Matsumoto stated that "[t]he most remarkable aspect of her musculoskeletal examination is her extreme tenderness not only in the joint areas but in the soft tissue as well. She is tender to even very light palpitation in the soft tissue areas." Dr. Newman likewise concluded that "[t]he patient has markedly positive and symmetric tender points." Finally, Dr. Murphy, whose records form the bulk of the clinical evidence before Continental, noted the existence of between eight and thirteen "trigger" points during Sanderson's March 2000–August

2000 medical visits. Dr. Truchelut did not offer a contradictory diagnosis on this point. Therefore, there was no reason for Continental to ignore the fact that the objective findings supported a diagnosis of fibromyalgia which could have produced Sanderson's subjective complaints of pain.[6]

Continental next argues that, in fact, it did not dispute that Sanderson suffered from an impairment, but rather, denied her benefits because she had failed to demonstrate that her ailment caused her to be unable to function in her job. *See* Continental's Combined Reply and Answering Brief (D.I.46) at 18. This argument too must fail, both for the reasons the court has stated above, as well as for the following reasons.

Sanderson submitted Dr. Murphy's June 12, 2000 Attending Physician statement in support of her claim. In that statement, Dr. Murphy indicates that Sanderson's symptoms included "pain, swelling and stiffness in all joints—esp. hands, wrists, shoulders, hips, neck, knees, ankles, feet." Dr. Murphy further stated that Sanderson "cannot use [her] hands due to extreme pain, her back/knee/feet pains severely limit her walking and standing."[7] The court recognizes that this assessment was completed within days of Sanderson's carpal tunnel syndrome surgery on her right hand.[8] However, Dr. Murphy reaffirmed her opinion on August 28, 2000, August 30, 2000 and again on November 28, 2000.

---

**6.** Continental contends that a conclusion contrary to its assertions on this point would contravene the Policy's requirements. The court disagrees. The Policy requires a claimant to provide "[o]bjective medical findings which support [her][d]isability. Objective medical findings include but are not limited to tests, procedures, or clinical examinations standardly accepted in the practice of medicine, for [her] disabling conditions." Policy at 15. Once such objective evidence is demonstrated, however, the policy does not then

disallow the consideration of subjective evidence, as Continental suggests.

**7.** It is undisputed that Sanderson's occupation "requires use of hands and walking/standing" Heidrich's Occupation Review dated July 5, 2000.

**8.** Sanderson's surgery on her right hand took place on June 7, 2000. She underwent surgery on her left hand on July 5, 2000.

Specifically, on November 28, 2000, Dr. Murphy noted that

"[a]lthough Ms. Sanderson suffers from a variety of chronic symptoms due to her illnesses, pain is the most debilitating of these symptoms. In fact, pain is the main reason that Ms. Sanderson cannot return to work at this point. Ms. Sanderson's pain is so severe that she has great difficulty performing basic life activities, such as walking, standing, dressing or eating. . . ."

Dr. Murphy's opinion was also supported by Sanderson's "Statement of Daily Activities" dated August 17, 2000. In that statement, Sanderson asserts, *inter alia*, that she cannot cook due to the pain in her legs and hands, she requires help with the laundry, her fiancee must assist her in bill paying by writing the checks for her to sign, she is in so much pain that some days she cannot dress herself, showering is difficult, and she requires assistance to go grocery shopping because she cannot walk through the store or lift items.[9] Finally, on August 30, 2000, Dr. Esham wrote to Continental and stated that Sanderson's "pain, stiffness and dependence on the [narcotic] drugs prevent her from resuming her former occupation, as much as she wishes to do so."

Thus, while Dr. Truchelut may have concluded otherwise with regard to Sanderson's functional capacities, Continental was not free to merely disregard her treating physicians' reports and findings in this regard in favor of an outcome more to its liking. More to the point, although Continental may have doubted the reliability of the conclusions or diagnoses of Sanderson's doctors, there is nothing in the record to indicate that Dr. Truchelut's opinion was any more supported or reliable. This is particularly true given the fact that he was not an examining physician. Since none of the evidence in the file was of surpassing reliability, there was no rational reason to simply give more weight to Dr. Truchelut's conclusions without a thorough and fully-supported discussion of why the conclusions of Sanderson's doctors should be rejected.

For all of the above reasons, the court finds that Continental impermissibly used evidence that supported the denial of Sanderson's benefits while ignoring, or failing to satisfactorily explain its rejection of, evidence supporting an award of long-term disability benefits. Evidence of Continental's severe conflict thus requires the court to afford Continental's decision substantially less deference than it would otherwise apply in a heightened arbitrary and capricious review.[10] Furthermore, based on the totality of Continental's above-described actions, the court finds that, under the appropriate standard of review, Continental's decision was arbitrary and capri-

---

9. The court also must point out that Sanderson's "Statement of Daily Activities" appears to be in direct contravention to Dr. Truchelut's notations in his report that Sanderson is able "to handle her daily personal needs," as well as pay her own bills.

10. Continental argues that, even if a conflict of interest existed, applying the additional *Pinto* factors demonstrates that its conflict is insignificant. *See Pinto*, 214 F.3d at 392 (listing sophistication of the parties, access to information, and the exact financial arrangement between the insurer and the company as potential ameliorating factors which the court may consider). The court disagrees. Briefly, there is no evidence in the record that Sanderson is sophisticated in insurance or medical matters. Continental next argues that she was given access to all of the information it relied upon in making its decision, and that Continental spent a considerable amount of time investigating this claim. However, no evidence suggests that these, or any other factor, makes it less likely that Continental's conflict of interest played a role in its decision to deny Sanderson's claim.

cious. *See Cohen v. Standard Ins. Co.*, 155 F.Supp.2d 346, 353–54 (E.D.Pa.2001) (stating that evidence demonstrating the defendant's conflict also demonstrates an arbitrary and capricious denial). Continental's motion for summary judgment is thus denied.

The court is not, however, in a position to determine whether Sanderson is, in fact, disabled. It is not beyond the realm of reality that, upon sufficiently, and explicitly, considering and weighing Sanderson's treating and examining physicians' opinions, Continental would again reach the same result. Thus, the court is unable to grant Sanderson's motion for summary judgment. Instead, the court concludes that remand is the appropriate remedy.

### B. Rhodia Inc. And Named Affiliates Group Disability Plan

■ Counsel for the defendants also requests that the court enter judgment as a matter of law in favor of Rhodia, Inc. And Named Affiliates Group Disability Plan ("the Plan") because no evidence exists that the Plan controls or influences, or has the right to control or influence, the administration of long-term disability claims filed under the Policy. For the following reasons, the court will enter judgment in the Plan's favor.

■ "The proper party defendant in an action concerning ERISA benefits is the party that controls administration of the plan." *Garren v. John Hancock Mut. Life Ins. Co.*, 114 F.3d 186, 187 (11th Cir.1997) (per curiam). In *Garren*, the insurance company sought to disclaim liability and filed an affidavit averring that it did not control administration of the plan at issue. *See id.* Furthermore, the named plan administrator there was the employer, and the evidence indicated that the employer controlled the administration of the plan. *See id.* On those facts, the court held that the employer, not the insurer, was the proper party defendant. *See id.* Likewise, in *Vaughn v. Metropolitan Life Ins. Co.*, the United States District Court for the Eastern District of Pennsylvania held that the insurer was the proper party because the "evidence demonstate[d] that [the insurer] possess[d] broad discretion in the interpretation of the plan, sole responsibility for the evaluation of claims, and financial decisionmaking authority over payment of benefits." 87 F.Supp.2d 421, 426 (E.D.Pa.2000).

In the present case, the parties agree that the Plan is administered through an insurance contract purchased from Continental. The Policy contains the insurer's contractual obligations under the agreement. On its face, the Policy provides that: "[w]e agree with the Employer to insure certain eligible employees of the Employer. We promise to pay benefits for loss covered by the policy in accordance with its provision." [11] Policy at 1. The parties further agree that, given that the Plan is fully insured, any potential obligation to pay benefits under the Plan is Continental's. *See* Plaintiff's Combined Opening and Answering Brief (D.I.43) at 1–2, n. 1 (agreeing that it is solely Continental's responsibility to pay benefits). Thus, because the Plan has neither the authority to determine whether long-term disability benefits are payable under the Policy, nor an obligation to pay any benefits which may become due, it is entitled to judgment as a matter of law.

### V. CONCLUSION

For the above reasons, the court finds that Continental's decision to terminate

---

**11.** As the court noted earlier, "we" is defined in the Glossary section of the Policy as refer- ring to the Continental Casualty Company. *See* Policy at 18.

Sanderson's benefits was arbitrary and capricious due to the self-serving nature of Continental's decision-making process. The court is unable to determine, however, Sanderson's disability status as a matter of law. Therefore, the court will remand this case to Continental for further proceedings consistent with this opinion.

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. The Plaintiff's Motion to Supplement Her Opening Brief (D.I.47) is GRANTED as unopposed.

2. The Defendants' Motion for Summary Judgment (D.I.39) is DENIED as to Continental and GRANTED as to Rhodia, Inc. And Named Affiliates Group Disability Plan.

3. The Plaintiff's Motion for Summary Judgment (D.I.42) is DENIED.

4. This matter is remanded to Continental, the claims administrator, to take further action consistent with this opinion.

### MEMORANDUM AND ORDER

## I. INTRODUCTION

On September 7, 2001, the plaintiff, Kimberly N. Sanderson ("Sanderson") filed the above-captioned action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* Through this action, she sought to recover long-term disability benefits which she claimed were due under a policy of insurance issued by Continental Casualty Company ("Continental") to her employer, Rhodia, Inc. On February 25, 2003, the court concluded that Continental's decision to deny Sanderson's disability benefits was arbitrary and capricious.

It thus remanded the case to Continental. ("Remand Order").[1]

Presently before the court is Continental's motion for reconsideration and a stay of the remand order. For the following reasons, the court will deny this motion.

## II. STANDARD OF REVIEW

■ As a general rule, motions for reconsideration should be granted only "sparingly." *Karr v. Castle,* 768 F.Supp. 1087, 1090 (D.Del.1991). In this district, these types of motions are granted only if appears that the court has patently misunderstood a party, has made a decision outside the adversarial issues presented by the parties, or has made an error not of reasoning, but of apprehension. *See, e.g., Schering Corp. v. Amgen, Inc.,* 25 F.Supp.2d 293, 295 (D.Del.1998); *Brambles USA, Inc. v. Blocker,* 735 F.Supp. 1239, 1240 (D.Del.1990) (citing *Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.,* 99 F.R.D. 99, 101 (E.D.Va.1983)); *see also Karr,* 768 F.Supp. at 1090 (citing same).

In addition, the Third Circuit has explained that a district court should also grant a motion for reconsideration which alters, amends, or offers relief from a judgment when: (1) there has been an intervening change in the controlling law; (2) there is newly discovered evidence which was not available to the moving party at the time of judgment; or (3) there is a need to correct a legal or factual error which has resulted in a manifest injustice. *See Max's Seafood Café by Lou Ann, Inc. v. Quinteros,* 176 F.3d 669, 677 (3d Cir. 1999) (relying on *North River Ins. Co. v. CIGNA Reinsurance Co.,* 52 F.3d 1194, 1218 (3d Cir.1995)).

---

**1.** For a complete recitation of the facts and procedural history of this case, please see *Sanderson v. Continental Cas. Co.,* 2003 WL 470539 (D.Del. Feb.25, 2003).

## III. DISCUSSION

■ The basis for Continental's current motion is the United States Supreme Court's May 27, 2003 decision in *Black & Decker Disability Plan v. Nord,* — U.S. ——, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). Specifically, Continental argues that the holding in *Nord* supercedes the holding and rationale underlying the Remand Order of February 25, 2003. Because a change in controlling law is an appropriate ground upon which to base a motion for reconsideration, the court will now address Continental's allegations.

Continental first contends that the Remand Order requires it to give special deference to the opinions of Sanderson's treating physicians. According to Continental, this is in contravention of the Supreme Court's recent holding that " . . . plan administrators are not obliged to accord special deference to the opinions of treating physicians." *Nord,* 123 S.Ct. at 1967. While Continental's point is well-taken, it is apparent that Continental bases its argument both on a misreading of the court's Remand Order and an unduly narrow reading of *Nord.*

■ As an initial matter, the court's Remand Order did not rely on the treating physician rule as the basis for its decision.[2] Indeed, the issue here is not whether Continental should have given the treating physician's opinions "substantial weight," but instead, why Continental decided to give multiple other forms of evidence no consideration at all, or conflicting consideration. *See e.g.* Remand Order at 13, n. 4 (questioning the veracity of Continental's claims that it had placed reliance on Dr. Matsumoto's findings in making its decision, when it later questioned Dr. Matsu-

moto's credentials); Remand Order at 14 (describing Continental's selective parsing of medical conclusions from the same doctor); Remand Order at 15, n.6 (recognizing that Continental may have disregarded relevant evidence due to an improper reading of the Policy's requirements). Moreover, the court found that Continental had summarily dismissed Sanderson's own subjective complaints of pain and her allegations of the independently disabling condition fibromyalgia. The court's concerns are clearly in accord with the Supreme Court's admonition in *Nord* that, "[p]lan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.* at 1972.

■ Likewise, Continental's next argument that the court has impermissibly placed upon it an undue burden of explanation in contravention of *Nord* must also fail. *See* 123 S.Ct. at 1972. Importantly, the Supreme Court found that ERISA plan administrators must provide the notice of denial in writing and wherein they set forth the specific reasons for the denial in an easily understandable manner. *See Nord,* 123 S.Ct. at 1970. Thus, although Continental appears to be contending that *Nord* releases plan administrators from any duty of explanation whatsoever, that is simply not the case. Indeed, as the court discussed above, the Supreme Court in *Nord* specifically recognized that, "[p]lan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." 123 S.Ct. at 1972. At no time did the Court hold that plan administrators need not provide any justification

---

2. Were this case to turn solely on the application of the treating physician rule, as Continental suggests, there would have been no need for the court to order a remand because an application of this rule would certainly have resulted in summary judgment being awarded in Sanderson's favor.

for rejecting evidence supporting a claimant's disability, particularly when it is clear, as it is here, that the administrators were engaged in a selective and self-serving review of the evidence.[3]

## IV. CONCLUSION

Because the issues in the present case far exceed the scope of the Supreme Court's holding with regard to the treating physician rule in *Nord*, the court concludes that reconsideration of its remand order is not warranted.

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. Continental's Motion for Reconsideration and Stay of Order of Remand (D.I.69) is DENIED.

---

[3.] It bears repeating that, through its Remand Order, the court is not suggesting that Continental must find Sanderson disabled. Rather, the court merely directs Continental to reach its decision on her disability after a review of the entire record before it.